UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**
MAY -7 2013
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN RE APPLICATION OF THE     )
UNITED STATES OF AMERICA FOR )  MISC. NO. 13-460
AN ORDER PURSUANT TO         )
18 U.S.C. § 2703(d)          )  **Filed Under Seal**
                             )

APPLICATION OF THE UNITED STATES
FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, moving by and through its undersigned counsel, respectfully submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed Order would require Google Incorporated ("Google"), an Internet Service Provider of electronic communication and remote computing services, headquartered at 1600 Amphitheater Parkway Mountain View, California, to disclose certain records and other information pertaining to the email account ███████████ (the SUBJECT ACCOUNT), as described in Part I of Attachment A. The records and other information to be disclosed are described in Part II of Attachment A to the proposed Order. In support of this application, the United States asserts:

LEGAL BACKGROUND

1. Google is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under § 2703(d) to require Google to disclose the items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2.   This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

3.   A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

## THE RELEVANT FACTS

4.   The United States is investigating the unauthorized disclosure of classified information connected with a disrupted suicide bomb attack on a U.S.-bound airliner by the Yemen-based terrorist organization Al-Qaeda in the Arabian Peninsula (AQAP) and the recovery by the United States of a bomb in connection with that plot in April 2012 (referred to hereinafter as "the bomb"). The investigation concerns possible violations of, inter alia, 18 U.S.C. § 793(d) (Unauthorized Disclosure of National Defense Information) and/or 18 U.S.C. § 793(g) (Conspiracy to Disclose National Defense Information).

5.   This investigation concerns the unauthorized disclosure of classified information connected with a disrupted suicide bomb attack on a U.S.-bound airliner by the Yemen-based terrorist organization Al-Qaeda in the Arabian Peninsula (AQAP) and the recovery by the United States of a bomb in connection with that plot in April 2012 (referred to hereinafter as "the

2

bomb"). Beginning on May 7, 2012, multiple news organizations published articles about the disrupted suicide bomb attack and recovery of the bomb. The lead article was published by ▮ ▮ reporters ▮ on May 7, 2012. It was entitled, "US: CIA Thwarts New al-Qaida Underwear Bomb Plot." Thereafter, ▮ and other media outlets published additional articles and/or broadcast television reports about the disrupted suicide bomb attack and recovery of the bomb (referred to collectively hereinafter as the "Media Reports").

6. During its investigation, the FBI has learned from Intelligence Community representatives and/or the FBI's own review of classified documents that the Media Reports contained, in part, information classified up to the TOP SECRET level.

7. Classified information, of any designation, may be shared only with persons determined by an appropriate United States government official to be eligible for access to such classified information, that is, the individual has received a security clearance, has signed an approved non-disclosure agreement, and possesses a "need to know" the information in question. If a person is not eligible to receive classified information, classified information may not be disclosed to that person.

8. The FBI's investigation has revealed that the first article about the disrupted suicide bomb attack and recovery of the bomb was published by ▮ at approximately 4:07 p.m. on May 7, 2012. The ▮ reporters who wrote that article were ▮ ▮

9. In connection with the disrupted suicide bomb attack, in late April 2012 the bomb was sent to the FBI Laboratory, in Quantico, Virginia (hereinafter referred to as the "FBI Lab"), for forensic examination by FBI bomb technicians and other forensic examiners and

scientists. The FBI's investigation has identified Donald John Sachtleben (SACHTLEBEN) as an FBI consultant who was present at the FBI Lab from May 2, 2012 through May 4, 2012.

10. FBI records reveal that, in April and May 2012, SACHTLEBEN possessed a TOP SECRET security clearance. Over his career at the FBI, SACHTLEBEN signed no less than three Classified Information Nondisclosure Agreements and no less than three Sensitive Compartmented Information Nondisclosure Agreements (together, NDAs) with the United States government. NDAs are legally binding agreements between an individual being granted, or already in possession of, a security clearance, and the United States government, wherein the parties agree that the individual shall never disclose classified information without the authorization of the United States government. The standard form NDA notifies the individual entering into the agreement with the United States government that the unauthorized disclosure of classified information can lead to criminal prosecution, to include a violation of 18 U.S.C. § 793.

11. The FBI's investigation has revealed that SACHTLEBEN traveled from Indianapolis, Indiana, to Tulsa, Oklahoma, on April 18, 2012, to conduct a training of law enforcement officers in his capacity as the Director of Training of OSU's Center for Improvised Explosive Research and Training. The training was conducted between April 24, 2012, and April 27, 2012 at OSU. SACHTLEBEN was joined at the training by at least one of his colleagues from the FBI Lab who assisted him in the training. On April 26, 2012, while that FBI Lab employee was still in Tulsa with SACHTLEBEN, the FBI Lab employee received an email from his supervisor at the FBI Lab. That email stated that the FBI Lab would imminently be working on a classified, "close hold" case. That FBI Lab employee has denied providing SACHTLEBEN with any information concerning the bomb.

12. The bomb arrived at the FBI Lab for forensic analysis at approximately 9:45 a.m. on April 30, 2012.

13. Two hours later, at approximately 11:33 a.m., the FBI Lab employee who was with SACHTLEBEN at the training in Tulsa, Oklahoma, sent an email to SACHTLEBEN's FBI email account that stated that the FBI Lab's Explosives Unit was "involved in a 24/7 rush case right now for which I am the chemist so my time is limited at the moment."

14. Examination of telephone toll records for a cellular telephone number associated with ▮ reporter ▮ revealed that two hours later, at approximately 1:32 p.m. on April 30, 2012, a call was made from a cellular telephone number for which SACHTLEBEN was the subscriber to a cellular telephone number for which ▮ was the subscriber. That call lasted approximately two minutes and eighteen seconds.

15. At 6:30 p.m. that evening, ABC World News Tonight broadcast a news story which stated, in part, that for the past year U.S. and European officials had warned that AQAP's master bomb-maker, Ibrahim al-Asiri, had been designing surgically implanted body bombs to get past airport security, and that there was concern that AQAP may soon try to explode a U.S-bound aircraft with an explosive hidden inside the bodies of terrorists.

16. Later that evening, beginning at approximately 7:13 p.m., four text messages were exchanged between ▮ cellular phone and SACHTLEBEN's cellular phone. These texts were as follows:

| Date | Time | Originating Cellular Phone | Terminating Cellular Phone | Content of Text Message |
|---|---|---|---|---|
| 4/30/2012 | 7:13 p.m. | ▮ | SACHTLEBEN | Al-Asiri is up to his old tricks. I |

---

[1] As part of the FBI's investigation, authorization was obtained pursuant to 28 C.F.R. § 50.10(d) to issue subpoenas for the telephone toll records for certain media personnel, including for ▮ ▮ Subscriber records confirmed that ▮ was the subscriber for the cellular phone number that had contact with SACHTLEBEN's cellular phone number.

| Date | Time | Originating | Terminating | Content |
|---|---|---|---|---|
| | | | | wonder if ur boys got a hold of a cavity bomb |
| 4/30/2012 | 7:14 p.m. | ███ | SACHTLEBEN | :) |
| 4/30/2012 | 7:15 p.m. | SACHTLEBEN | ███ | Yikes. Remind me to bring sum purell to the lab |
| 4/30/2012 | 7:15 p.m. | ███ | SACHTLEBEN | Not totally sure though |

17. Beginning at approximately 9:50 a.m. the following day (May 1, 2012), two more text messages were exchanged between SACHTLEBEN's cellular phone and ███ cellular phone. These text messages were as follows:

| Date | Time | Originating Cellular Phone | Terminating Cellular Phone | Content of Text Message |
|---|---|---|---|---|
| 5/1/2012 | 9:50 a.m. | SACHTLEBEN | ███ | Hmm... Methinks the 10am news conf may b related |
| 5/1/2012 | 9:50 a.m. | ███ | SACHTLEBEN | Ah! |

18. At approximately 10:00 a.m. on May 1, 2012, the FBI held a news conference concerning the arrest of five men in Cleveland, Ohio, who were charged with plotting a bomb attack on a bridge in Ohio.

19. Thereafter, SACHTLEBEN's cellular phone sent two text messages to ███ cellular phone. Those texts were as follows:

| Date | Time | Originating Cellular Phone | Terminating Cellular Phone | Content of Text Message |
|---|---|---|---|---|
| 5/1/2012 | 10:04 a.m. | SACHTLEBEN | ███ | Just abt to take off.[2] Will b curious to c coverage when I land at dulles. Hope that tsa doesn't get out the rubber gloves and ky |
| 5/1/2012 | 12:49 p.m. | SACHTLEBEN | ███ | Got that one wrong. A lil surprised they r wrkin 24 hr shifts cuz of those mutts. Still mght b sumthin |

---

[2] The FBI's investigation has revealed that on May 1, 2012, SACHTLEBEN flew from Indianapolis, Indiana, to Dulles International Airport located in Chantilly, Virginia.

6

|  |  |  |  | else brewin. Will find out tomorrow |
|---|---|---|---|---|

20. FBI computer log-on records reveal that beginning at approximately 9:05 a.m. the next morning (May 2, 2012), SACHTLEBEN's unique electronic computer profile logged into the FBI's classified computer system from a computer terminal located within the FBI Lab in a room directly adjacent to the suite of rooms where the bomb was being examined. SACHTLEBEN's computer profile logged off of the FBI Lab's computer terminal at approximately 10:16 a.m. on May 2, 2012.

21. At approximately 10:25 a.m., SACHTLEBEN's cellular phone placed a two minute and seven second call to ▇▇▇▇ cellular phone.

22. Approximately two-and-a-half hours later, ▇▇▇▇ and another ▇ reporter called or sent text messages to multiple United States government officials and stated that ▇ knew the following facts: (1) the United States had intercepted a bomb from Yemen; (2) the FBI was analyzing the bomb; and (3) ▇ believed, but had not confirmed, that the bomb was linked to AQAP's premier bomb-maker, Ibrahim Al-Asiri. During its investigation, the FBI has learned from Intelligence Community representatives and/or the FBI's own review of classified documents that the facts the ▇ reporters stated they knew as of May 2, 2012 (namely, (1) and (2) in the immediately preceding sentence) constituted classified information as of that date.

23. Additionally, the FBI's investigation has revealed that United States government officials engaged in an effort to stop or delay publication of the ▇ story concerning the recovery of the bomb. ▇ published its first story concerning the disrupted suicide bomb attack and recovery of the bomb on May 7, 2012.

7

24. The FBI's investigation has revealed that between May 8, 2012, and May 10, 2012, SACHTLEBEN was in Kansas City, Missouri, conducting a training of law enforcement officers for the FBI's National Improvised Explosive Familiarization program (NIEF). At least two FBI Lab employees who had worked, or were working, on the examination of the bomb were in Kansas City with SACHTLEBEN assisting him with the NIEF training. Both employees have denied providing SACHTLEBEN with any information concerning the bomb.

25. At approximately 2:16 a.m. on May 9, 2012, ▮▮▮▮ published another story concerning the disrupted suicide bomb attack. That story asserted that the bomber in the disrupted suicide bomb plot was working for "Saudi intelligence."

26. Beginning at approximately 7:32 a.m. on the morning of May 9, 2012, five more text messages were exchanged between SACHTLEBEN's cellular phone and ▮▮▮▮ cellular phone. These text messages were as follows:

| Date | Time | Originating Cellular Phone | Terminating Cellular Phone | Content of Text Message |
|---|---|---|---|---|
| 5/9/2012 | 7:32 a.m. | SACHTLEBEN | ▮▮▮ | ▮▮▮ is pissed this morning aftr reading ur piece. Guess u got it right. |
| 5/9/2012 | 7:35 a.m. | ▮▮▮ | SACHTLEBEN | Interesting. This whole tale is still very murky. That's for sure. But we were told this device cud be replicated very easily. It was not hard to build. |
| 5/9/2012 | 8:10 a.m. | SACHTLEBEN | ▮▮▮ | They r workin on that notion right now. |
| 5/9/2012 | 8:35 a.m. | ▮▮▮ | SACHTLEBEN | That the device is easy to build? |
| 5/9/2012 | 9:02 a.m. | SACHTLEBEN | ▮▮▮ | They r makin one just to see how they did it. Not sure we r sayin it is easy. Plus we r not mkin it in a |

---

[3] The FBI's investigation has revealed that ▮▮▮ was a FBI colleague of SACHTLEBEN who was assigned to the bomb examination team at the FBI Lab. FBI records show that ▮ ▮▮ was in Kansas City, Missouri, assisting SACHTLEBEN in the NIEF training between May 8, 2012, and May 10, 2012.

8

|  |  |  |  | mud hut. |
|---|---|---|---|---|

27. Thereafter, on May 9, 2012, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ published another story concerning the disrupted suicide attack. That story stated that the "FBI is attempting to replicate bomb [sic], trying to determine how destructive the bomb would have been and how easy it would be for AQAP to build another."

28. During the course of its investigation, the FBI learned about two Chase Bank credit cards that were associated with SACHTLEBEN. On March 7, 2013, the United States obtained from Chase Bank customer records for one of those cards indicating that SACHTLEBEN was the primary applicant for the credit card, and that the email address ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was associated with the account.

29. On April 4, 2012, the United States obtained subscriber information from Microsoft Corporation for the email account ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Those subscriber records listed the name Donald Sachtleben in the "User Info" field for the account, and the name ▓▓▓▓▓▓▓▓▓▓ in the "Subscriber Information" field for the account. The investigation has revealed that ▓▓▓▓▓▓▓▓ is SACHTLEBEN'S wife.

30. On or about March 14, 2013, the United States submitted an application under seal pursuant to 18 U.S.C. § 2703(d), for an Order to Microsoft Corporation to disclose non-content header and footer information for the email account ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. On or about March 14, 2013, United States District Court Magistrate Judge Deborah A. Robinson signed an Order directing Microsoft Corporation to disclose non-content information for the email account ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ within 10 days of the date of the Order. On or about April 4, 2013, Microsoft Corporation delivered the requested records to the FBI (hereinafter "MSN Records"). Review of the MSN Records revealed that approximately 12 emails were sent

from the email account ▮▮▮ to the email account ▮▮▮ in 2012. Specifically, emails were sent from the account ▮▮▮ to the account ▮▮▮ once on January 6, 2012, twice on February 16, 2012, once on April 10, 2012, once on April 12, 2012, once on April 13, 2012, once on April 17, 2012, once on April 20, 2012, and three times on April 29, 2012. The following day, April 30, 2012, a phone call and multiple text messages were exchanged between SACHTLEBEN's cellular phone and ▮▮▮ cellular phone. See supra ¶¶ 17-19.

31. On March 12, 2013, ▮▮▮ reporter ▮▮▮ emailed an FBI Public Affairs employee from the SUBJECT ACCOUNT to inquire about FBI Lab employee ▮▮▮ was working on the examination of the bomb in April and May 2012. See supra ¶ 26 and FN 3. The FBI Public Affairs employee described ▮▮▮ request as coming from ▮▮▮ who were writing a book at the time entitled ""Enemies Within: Inside The NYPD's Secret Spying Unit and the Most Dangerous Terror Plot Since 9/11."

32. ▮▮▮ have worked together on multiple news stories for ▮▮▮ and, as referenced in the above-paragraph, are currently writing a book together. Together, ▮▮▮ authored the lead articles regarding the recovery of the bomb at issue in this investigation. See supra ¶¶ 5, 8, 23. The United States has developed evidence that SACHTLEBEN and ▮▮▮ were in email and phone contact just before the unauthorized leak of classified information under investigation in this case occurred. It has further developed evidence that ▮▮▮ has used the SUBJECT ACCOUNT to reach out to employees at the FBI Lab who work on bomb investigations, including an employee that worked on the bomb investigation at issue in this investigation. Thus, there are reasonable grounds to

believe that non-content header information from the SUBJECT ACCOUNT will provide relevant material to this ongoing criminal investigation. At a minimum, the requested records will show whether ▮ communicated from the SUBJECT ACCOUNT with other employees at the FBI Lab in late April and May 2012, who were working on the analysis of the bomb, or who were aware that the bomb was being analyzed at the FBI Lab.

## REQUEST FOR ORDER

33. The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States to identify and locate the individual(s) who are responsible for the events described above, and to determine the nature and scope of their activities. Accordingly, the United States requests that Google be directed to produce all items described in Part II of Attachment A to the proposed Order.

34. The United States further requests that the Order require Google not to notify any person, including the subscribers or customers of the account(s) listed in Part I of Attachment A, of the existence of the Order until further order of the Court. *See* 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id.* In this case, such an order would be appropriate because the requested Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to believe that

notification of the existence of the requested Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates. *See* 18 U.S.C. § 2705(b)(2), (3), (5). Some of the evidence in this investigation is stored electronically. If alerted to the investigation, the subjects under investigation could destroy that evidence, including information saved to their personal computers.

35. The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Ronald C. Machen Jr.
UNITED STATES ATTORNEY

Mona Sahaf
Assistant United States Attorney
National Security Section
555 Fourth Street, N.W., 11th Floor
Washington, D.C. 20530
Tel: 202-252-7080
E-mail: Mona.Sahaf@usdoj.gov